LOLA E. HANCOCK, ADMINISTRATRIX OF ESTATE OF EUGENE P. HANCOCK, v. KANSAS CITY TERMINAL RAILWAY COMPANY, a Corporation, Appellant.—100 S. W. (2d) 570.

Division One, December 14, 1936.

1238

*S. W. Sawyer, John H. Lathrop* and *James F. Walsh* for appellant.

*Madden, Freeman & Madden* for respondent.

1240

FERGUSON, C.—This is an action for damages under the Federal Employers' Liability Act brought by Mrs. Lola E. Hancock, as administratrix, for the death of her husband, an employee of the defendant railway company, who was killed on March 23, 1932, while engaged in a switching operation in defendant's yards at Kansas City, Missouri. The action was filed and tried in the Circuit Court of Jackson County, at Kansas City; the jury returned a verdict for plaintiff in the sum of $50,000. As a condition to the overruling of defendant's motion for a new trial the trial court required a *remittitur* in the amount of $20,000. The *remittitur* was made, defendant's motion for a new trial overruled, and judgment for plaintiff in the amount of $30,000 entered; from which judgment defendant has appealed. No question is made as to the applicability of the Federal Employers' Act.

Hancock had been in the employ of defendant company since 1920 and was thirty-eight years of age at the time of his death. He left surviving him his widow, Lola E. Hancock, who brings this action as administratrix, and one child, a son, of the age of eleven years. Hancock was a switch foreman and on the morning of March 23, 1932, his crew was engaged in distributing the cars from a train of thirteen to fifteen cars which had been brought from defendant's yards in Kansas to its yards in Kansas City, Missouri. One of these cars had been cut off and left on the main lead track near the west end of the yard. After various cars had been delivered to their respective destinations the crew with their switch engine proceeded west on this lead track to couple onto the car which had been left on that track and move it to its point of assignment. The crew was composed of Hancock, the foreman; Barnes, the engineer; Ferguson, fireman; and Bryning and McCormack, switchmen. The engine was backing west. Hancock and the two switchmen, Bryning and McCormack, were standing upon the footboard at the rear of the tender as the engine, backing, moved west. The footboard is not continuous across the rear of the tender but "is divided in the center by the drawbar . . . so that there is a footboard on each side of the drawbar;" and "there is a grabiron clear across the back of the tank to hold on to when riding the footboard." Each half, or section, of the footboard is "39 inches in length on the outer edge." "11 inches in width and extends "19 1/2 inches outside of the rail." Switchman Bryning was standing alone on the north section of the footboard and McCormack and Hancock were on the south section with McCormack standing next to the drawbar and Hancock at the south end; they were facing west, the direction in which the engine was backing. As the engine approached switch No. 715 it was observed that the switch was so lined that the engine would be diverted to track 715. Hancock, who was on the south end of the south footboard, and in position to do so, gave a stop signal. The engine stopped three to five

feet east of the switch stand. Bryning and McCormack remained on the footboard. Hancock stepped off, walked to the switch stand, lined the switch so the engine could proceed on west down the lead track, walked to the west side of the switch, gave the signal for the engine to resume its westward movement and took a position at the south side of the track indicating his intention to get on the footboard of the tender. In response to the signal the engine was started and moved west at a speed of "3 or 4 miles an hour." In attempting to get on the south end of the south section of the footboard, his former position, Hancock fell across the south rail and in front of the moving tank. McCormack "screamed." The enginemen hearing the "screams" brought the engine to a quick stop. However, both wheels of the west truck on the south side of the tender passed over Hancock's body. The body was found lying across the south rail and between the east and west trucks (on the south side) of the tank. Hancock was instantly killed. The casualty occurred about nine-thirty A. M.

To this point the facts may be said to be undisputed. But two eyewitnesses were produced who testified to having seen Hancock fall. Plaintiff's sole eyewitness was one Reinhardt, an employee of a transfer company, who testified that at the time he was in defendant's yards in connection with business of his employer; that he was walking east on the south side of the track toward this switch stand; that when he was yet "250 to 300 feet" from the switch stand he "first noticed the engine" backing west; that he continued walking east toward the engine; that he plainly observed the positions of the men on the footboard of the tank; that he observed the subsequent events and Hancock's movements; that while Hancock was throwing the switch Bryning (on the north section of the footboard) and Mc-Cormack (standing by the drawbar on the north end of the south section of the footboard) turned facing each other across the drawbar; that as Hancock started to "step on the footboard" McCormack "turned and stepped completely over in Hancock's path . . . their bodies came in contact" and "it knocked Hancock down." It was clearly McCormack's duty, under the circumstances and under plaintiff's evidence as to the custom and practice prevailing in the yards to remain next to the drawbar and not move to the south end of the footboard. McCormack testified that when Hancock fell he (McCormack) "yelled as loud as I could yell," jumped from the footboard and went west down the side of the track a distance of about 300 feet where he remained with another switchman until after Hancock's body had been taken away. Bryning denied that he was facing McCormack across the drawbar but says that while Hancock was throwing the switch and at the time he fell, while trying to get on the footboard, he was facing to the north and that he did not see Hancock try to get on the tender or see him fall. Defendant had some

very positive and substantial evidence tending to show that plaintiff's witness Reinhardt, upon whose testimony plaintiff's case must stand or fall, was not in its yards at the time he states he witnessed Hancock's death but that at that time he was in Kansas City, Kansas, delivering a refrigerator in the course of his employment with the transfer company. The only other eyewitness was McCormack who testified, as a witness for defendant, that he did not move from the position next to the drawbar;'' that he did not turn facing Bryning but continued facing west, ''looking at Hancock;'' that when Hancock ''attempted to get on the footboard he (Hancock) reached for the grabiron and apparently missed the grabiron and fell;'' that ''I grabbed for him with my left hand'' but ''I didn't get hold of him;'' that ''I yelled as loud as I could yell;'' and that ''I did not change my position when he was trying to get on.''

Appellant does not here contend, and there is no ground for such contention, that respondent, plaintiff, did not make a case for the jury. The assignments of error made are; (1) that instruction numbered 4, relating to damages, given at plaintiff's request, is erroneous; (2) that the trial court erred in refusing an offer of proof made by defendant; (3) argument of plaintiff's counsel; and (4) that the verdict for $50,000 was so grossly excessive as to evidence passion and prejudice on the part of the jury, and that the judgment for $30,000 entered by the trial court, after *remittitur*, is still clearly excessive.'' Of these in order.

Plaintiff's instruction relating to damages is in part as follows: ''If you find a verdict in favor of the plaintiff and against the defendant and further find that the deceased was not guilty of negligence contributing to his death, then you are instructed that you should assess the damages (if any) in this case at such sum (if any) as will fairly and reasonably compensate the wife and child of deceased for the pecuniary loss (if any) which you find from the evidence they sustained as a direct result of his death.'' The instruction then lays down the applicable rule under the provisions of the Employers' Liability Act that if the jury find that negligence on the part of plaintiff contributed to but did not ''solely'' cause his death that such negligence on plaintiff's part ''would merely diminish the damages,'' and continues: ''If, therefore, you find that deceased's death directly (if so) resulted from the negligence (if any) of defendant, as defined in other instructions, but that deceased was himself guilty of negligence contributing to his death, as defined in other instructions, then the plaintiff cannot recover full damages (if any), but only a proportional amount thereof bearing the same relation or ratio to the full amount of damages (if any) by plaintiff sustained as the negligence (if any) attributable to the defendant bears to the entire negligence (if any) attributable to both deceased and defendant. In this connection, however, the court instructs you that

unless you believe and find from the greater weight of the credible evidence in the cause that deceased was guilty of negligence contributing to his death, as defined in these instructions, your finding on that issue should be in favor of the plaintiff and no amount should on that account be deducted from the actual damages (if any) you find plaintiff sustained from said death." Defendant (appellant here) did not offer an instruction on damages but while the requested instructions offered by both plaintiff and defendant were under advisement by the court defendant's counsel made an oral request that the court require plaintiff to give "some form of instruction . . . limiting recovery, if any by plaintiff, to the present value of future financial benefits which might reasonably have accrued from the continued life of Hancock and not leave the jury with a roving commission without any direction or limitation in that regard . . . and also that the instruction on damages offered by plaintiff be required to limit the recovery, if any, in favor of James Hancock (the minor child) to the period of his minority and . . . to the present value." The court: "The request will be refused but of course you have a right to offer any instruction you desire limiting the amount of recovery. The court will be very happy to confer with you about it and do anything proper in the matter." Defendant, however, refused to prepare and offer such instruction.

Referring to the first part of the instruction above set out appellant complains that it is too general. It tells the jury that if they find "in favor of plaintiff" and that "deceased was not guilty of negligence contributing to his death" they should "assess the damages . . . at such sum as will fairly and reasonably compensate the wife and child of deceased for the pecuniary loss . . . which . . . they sustained as a direct result of his death." The same complaint against the instruction made by appellant in its oral request to the trial court is renewed here. The instruction though general is correct; the measure of damages, under the circumstances defined, being such an amount as would reasonably compensate the wife and minor child of deceased for the pecuniary loss which they sustained as a direct result of his death. It is stated, in Chesapeake & Ohio Ry. Co. v. Kelly, Admr., 241 U. S. 485, 489, that, in this kind of a case, "The damages should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased." Louisville & Nashville Railroad Co. v. Holloway, Admr., 246 U. S. 525, was an action by the administrator of a deceased employee, "killed . . . while engaged in the performance of his duties," brought under the Federal Employers' Liability Act, for the benefit of the widow. The instruction defined the measure of damages as "an amount" which "will fairly and reasonably compensate the widow of the said John G. Holloway, deceased, for the loss of pecuniary benefits she might rea-

sonably have received if the deceased had not been killed." The opinion holds first that, "the instruction given, though general, was correct." It is then said: "(It) did not imply that the verdict should be for the aggregate of the several benefits payable at different times; without making any allowance for the fact that the whole amount of the verdict would be presently paid at one time. The instruction bore rather an implication to the contrary; for the sum was expressly stated to be that which would 'compensate.' . . . The company had, of course, the right to require that this general instruction be supplemented by another calling attention to the fact that, in estimating what amount would compensate the widow, future benefits must be considered at their present value. But it did not ask for any such instruction." We find no reason or authority which inclines us to depart from the ruling of this court in Pope v. Terminal Railroad Assn. of St. Louis (Mo.), 254 S. W. 43. That was an action under the Federal Employers' Liability Act by the widow of the deceased employee, as administratrix, for the benefit of herself and an only child. Plaintiff's instruction on damages directed the jury: "In determining the measure of damages, if any, you should take into consideration *only the pecuniary loss* sustained, if any, by reason of his death, by his widow, Nadine Pope, . . . and by his child, Dorothy Pope." The opinion states that (as in the instant case) "complaint is made the jury should have been instructed that the damages should be limited to the present value of the aggregate of the amounts that defendants are entitled to receive during the expectancy of the deceased husband and father." The instruction was, however, approved and held sufficient on the authority of the Holloway case, supra. Comparing the instruction with the instruction ruled in the Holloway case this court said: "They are worded differently, but the effect of each is the same. They reach the same basic principle for the measure of the damages." Powell v. Union Pacific Railroad Co., 255 Mo. 420, 164 S. W. 628, is a very similar case. That was an action for damages for the death of one Powell, who was killed while a passenger on one of defendant's trains, brought by his widow, as administratrix, for the benefit of herself, as widow, and her minor child. The damages recoverable were strictly compensatory and it was held that the pecuniary loss sustained by the widow and minor child, on account of the death of the husband and father, was the measure of damages. On plaintiff's request the trial court instructed the jury: "If you find for plaintiff then you should assess her damages, if any, at such sum, . . . as you believe and find from the evidence to be a fair and just pecuniary compensation, only, for damages, if any, to her and her daughter, occasioned by the death of Frederick Powell." This court approved the instruction. One complaint made against the instruction in the instant case is that it does not define pecuniary loss. In the Powell case a like complaint was made that

the term "pecuniary compensation" was not defined but this court held that such term required no definition. As in the present case, the defendant in the Powell case did not offer any instruction on damages and this court said: "If defendant feared that . . . they (the jury) would wander into by and forbidden paths of conjecture unless fenced in by more simple phraseology, or hedged about by limitations on the elements constituting the damages, it should have tried to help itself at the very time of need, to-wit, at the trial." In this connection the opinion makes this further comment: "Defendant below stood mute and asked no instruction on the measure of damages. It pitched its battle at other points. It exhausted its solicitude elsewhere and on other questions. It may not now, with its corporate heart bowed down with the woe of defeat, and its corporate eyes washed and brightened by the tears of affliction, elicit appellate interest in a matter it cared nothing about below." In Browning v. Wabash Western Ry. Co., 124 Mo. 55, 27 S. W. 644, the Court en Banc long since laid down the applicable rule where plaintiff's instruction on damages though general correctly states the measure of damages and defendant does not elect to offer an amplifying instruction on damages pointing out the elements and matters which the jury may properly consider in arriving at the amount of damages to be assessed in the event they find for plaintiff. It was there said: "The defendant asked no instruction on the measure of damages whatever. No attempt was made by it to point out the proper elements of damage in such cases or to modify the general language of the (plaintiff's) instruction. The instruction is not erroneous in its general scope; and if, in the opinion of counsel for defendant, it was likely to be misunderstood by the jury, it was the duty of counsel to ask the modifications and explanations, in an instruction embodying its views." In Laycock v. United Railways Co., 290 Mo. 344, 356, 235 S. W. 91, 94, the Court en Banc said: "It is well established law, that the generality of an instruction on the measure of damages in personal injury suits, does not constitute reversible error, unless defendant asks instructions specifically pointing out the proper lines of limitation for the jury to follow in arriving at the amount of damages." [See, also, Holman v. St. Louis-San Francisco Ry. Co., 312 Mo. 342, 369, 278 S. W. 1000, 1008; Gill v. Baltimore Ohio Railroad Co., 302 Mo. 317, 259 S. W. 93; Keyes v. Chicago, B. & Q. Railroad Co., 326 Mo. 236, 267, 31 S. W. (2d) 50, 64.] What we have said applies also to appellant's criticism that the instruction did not specifically define "pecuniary loss" as to the minor child limiting same to the "present value of lost benefits during minority." Under the evidence the only pecuniary loss sustained by the minor child was during minority. No unusual or peculiar facts or circumstances were in evidence tending to show any basis for the reasonable expectation of pecuniary benefits accruing to the minor child beyond

the period of minority. As heretofore observed the instruction while couched in general terms nevertheless correctly stated the basic measure of damages. If defendant was of the opinion that the instruction because of its generality might be misunderstood by the jury it had the right, which it did not choose to exercise, to submit an explanatory or modifying instruction defining and clarifying the term "pecuniary loss," restricting same within the proper limits, and advising the jury as to the elements and matters they might properly consider in arriving at the amount of damages to be assessed in the event they found for plaintiff. This defendant did not do.

■ Appellant advances the claim that its oral request, heretofore set out, that the trial court require plaintiff to modify or supplement her instruction on damages to conform to certain views of defendant, stated in general terms, relating to damages and the computation thereof, was a request for an instruction embodying those views which the court refused. Such request is of no effect whatsoever and did not amount to a request for an instruction upon the matters referred to therein. Our statute (Sec. 967, R. S. 1929) and long recognized and established procedure requires that requested instructions "shall be in writing" and submitted in that form for the consideration of the trial court.

Appellant criticizes the concluding part of the instruction, wherein the jury is told, in connection with the preceding direction in reference to proportional damages in the event they find deceased was contributorily negligent that; "Unless you believe and find from the greater weight of the credible evidence . . . that deceased was guilty of negligence contributing to his death . . . your finding on that issue should be in favor of the plaintiff and no amount should, on that account, be deducted *from the actual damage . . . you find plaintiff sustained from said death.*" (Italics ours.) Appellant says the administratrix was the plaintiff and that "there was no proof that the estate sustained any damages" and therefore "there was no amount from which the jury could deduct anything for contributory negligence of the deceased." While the wording is inaccurate we cannot conceive how the jury upon the whole instruction could have possibly been misled thereby. The instruction plainly tells the jury that the full measure of damages is such sum "as will fairly and reasonably compensate the wife and child of deceased for the pecuniary loss they sustained as a direct result of his death" and that plaintiff administratrix was entitled to recover such sum "if deceased was not guilty of negligence contributing to his death." Clearly we think, a jury would understand the words "actual damages plaintiff sustained from said death," in the connection in which they are used, to refer to that sum as previously defined in the instruction. Appellant's assignment of reversible error in the instruction must be disallowed.

■ During the direct testimony, of defendant's witness A. D. Williams, who was the general yardmaster for defendant railway company, the following occurred: "Q. (MR. LATHROP, counsel for defendant) I want to ask you if prior to this date of his death you had had occasion to discipline him for drinking while on duty?

"(MR. MADDEN, counsel for plaintiff) : Object to that as improper.

"THE COURT: Be sustained." (Defendant's exception noted.)

"MR. LATHROP: I would like to make an offer.

"THE COURT: All right.

"MR. LATHROP (out of the presence and hearing of the jury) : Defendant offers to prove by this witness that on several occasions prior to March 23, 1932, he had occasion to discipline Eugene Hancock for drinking while engaged in the performance of his duties and at one time he had occasion to take him clear out of service, that is discharge him, and then later reinstated him. I believe it is competent on several questions, that first it will corroborate further testimony to appear in this case, and secondly it seems to me that it has something to do and it is for the consideration of the jury on the question of this man's probable life expectancy, because a man who drinks in the performance of railroad work cannot be expected under normal conditions to live as long as one who does not.

"MR. MADDEN: I object to that as improper.

"THE COURT: Do you make the same objection that you did at the time the question was asked?

"MR. MADDEN: Yes object to it as improper and incompetent, irrelevant and immaterial.

"THE COURT: Be sustained." (Defendant's exception noted.) Appellant assigns the refusal of this offer of proof as error. It will be noted that neither the question nor the offer of proof purports to show as a fact, within the personal knowledge or observation of the witness, that Hancock either frequently or occasionally drank whisky "while engaged in the performance of his duties" or a habit of drunkenness or intoxication on the part of Hancock. We are not therefore called upon to do so and do not rule upon the competency, for the purposes stated, of evidence tending to show such facts; that question is not presented by this assignment. By the question and the offer of proof, as made, defendant proposed merely to show that the witness, its general yardmaster, had with or without some kind of a hearing, at an undisclosed time and upon undisclosed information, made a disciplinary finding and had seen fit to take some disciplinary action against Hancock "for drinking while engaged in the performance of his duties." Even if evidence that Hancock was in the habit of becoming intoxicated or that he frequently drank whisky while on duty was competent for any of the purposes stated such facts could not be established by the mere showing that the yardmaster had made a disciplinary finding against him on that ground. Proof

merely of the disciplinary finding and action is not proof of such facts. Defendant did not propose to show by this witness that he had personal knowledge of habitual intoxication on the part of Hancock or that he had observed, or personally knew of, Hancock drinking whisky while on duty. The trial court did not in our opinion err in sustaining plaintiff's objection to the offer of proof.

We come now to appellant's assignment that argument of plaintiff's counsel to the jury was "highly prejudicial and aroused the passions and prejudices of the jury which inhered in the verdict" and that "the trial court erred in denying defendant's motions to discharge the jury and declare a mistrial" on account thereof. In this connection we shall first review the evidence, and certain incidents of the trial, bearing on one of the issues of fact not heretofore mentioned. In his opening statement to the jury plaintiff's counsel stated: "There is one other matter that I do not know whether counsel relies upon or not in this case, it does not appear in the pleadings. When this death occurred a deputy coroner was called, of course, and . . . subsequently there was a coroner's inquest where all of the members of this crew testified to facts surrounding this occurrence. . . . Subsequently to that, the depositions . . . of all of these crew members was taken, and the final and last deposition taken was of the man McCormack. . . . In the testimony of the crew members at the coroner's inquest . . . there is not a single suggestion that Mr. Hancock was not comporting himself in the usual way and with his usual efficiency that day, and it was not until the last deposition was taken, the deposition of the man McCormack charged with the negligence in the case that we came upon any claim indicating that this accident happened contrary to the theory which I have presented here today, and McCormack then for the first time said that he saw Hancock take a drink that day and that he thought that he was a little bit under the influence of liquor. . . . Now the evidence in this case, gentlemen, will show that that charge of intoxication made by McCormack alone of all concerned is absolutely baseless. The other crew members, McCormack's own associates that day, will testify that that is not true, as will other men who saw Hancock that day in performance of the hazardous and difficult duties of railroading, they will testify that there wasn't a suggestion of anything like that in his conduct from the beginning to the end. . . . I say again that that is no defense if the facts are as I have stated them to you, but we will defend the good name of the dead man by evidence which will be overwhelming." The only reference to the foregoing matter appearing in the opening statement of defendant's counsel was: "Now Mr. Madden talked to you about this matter of drinking. It is true that Mr. McCormack testified in his deposition that he saw Mr. Hancock taking a drink and there was a coroner's inquest—Mr. McCormack wasn't asked

1250

about that at that time, but the deputy coroner in the course of his duties for the coroner of Jackson County performed an autopsy on Mr. Hancock and alcohol was found in his stomach. Now gentlemen, whether Mr. Hancock slipped or lost his balance, or whether it was the effect of this alcohol on him, he fell there, not through any act of McCormack, but he fell and had this accident there, this unfortunate accident in falling . . . and getting run over.''

It will be recalled Hancock was killed about nine-thirty A. M. Apparently anticipating that McCormack, as a witness for defendant, would testify, as he had in his deposition, that about ten minutes before Hancock fell to his death he saw him take a drink of whisky, in its direct case, plaintiff called the following witnesses who testified they had seen Hancock during the morning and testified to his condition, as they observed it. Two employees of a coal company, two employees of a petroleum company and an employee of a transfer company, who testified they were in the yards that morning in connection with their employment, each stated that he had talked with Hancock that morning between nine and nine-thirty o'clock and variously stated; ''I did not see the slightest evidence of intoxication,'' or ''that he had been drinking'' and ''he appeared sober.'' Two employees of a cement company and another employee of the transfer company stated that they were well acquainted with Hancock, were in the yards that morning, where their employment frequently took them, and that while they did not talk with Hancock that morning they saw him about his work and ''he performed his duties just like he always did.'' A truck driver for a coal company testified he ''talked with Hancock about five minutes before he was killed'' and ''he didn't look like a man who had been drinking and I didn't smell nothing on him.'' Two Kansas City police officers testified that in response to a radio call they arrived at the scene of the accident within a few minutes after Hancock was killed; one, O'Bryant, who remained there but momentarily, leaving to call the coroner and the homicide squad, stated: ''I saw no evidence of liquor'' and ''did not smell liquor;'' the other, Propst, said; ''I did not examine the body'' and ''did not see any bottle of liquor around there.'' No examination was made nor was the body moved until the deputy coroner and the police homicide squad arrived. The engineer of the switch engine Barnes was called as a witness, by plaintiff. On direct examination he said: ''I saw no evidence of intoxication on the part of Hancock that day.'' On cross-examination he stated that, after the accident he went ''under the tank'' (as the writer recalls Barnes was the only person who went under the tank prior to the arrival of the deputy coroner and the police homicide squad) and ''while I was down there beside him I smelled liquor.'' Ferguson, the fireman, Bryning, a switchman and Rapier, a switchman, all members of the switch crew of which Hancock was foreman, were

called as witnesses by the defendant. On direct examination they were not asked anything about Hancock drinking or whether they had seen or smelled whisky about him that day. On cross-examination they testified respectively as follows; Ferguson: "I did not see or smell liquor about Hancock that morning; Bryning: "I saw no evidence Hancock was intoxicated that day . . . I did not see or smell any whisky there that day" and "I did not see them take any whisky off his body or from the ground around him when the body was removed;" Rapier: "As far as I saw he (Hancock) appeared to be sober" and "as far as I know he was not drunk."

Defendant's evidence relative to this issue consisted of the testimony of two police officers, Nichols and Kurth, members of the homicide squad, a deputy coroner who made the autopsy, and McCormack. Nichols testified that when he and Kurth arrived "the body had not been disturbed;" that he assisted a deputy coroner in removing the body; that "when we got underneath the tender to take the body from across the rails and lay it out to the side of the track I smelled a fairly strong odor of liquor;" that he saw the deputy coroner make a search of deceased's clothes; that the deputy coroner "went through the pockets—a watch, handkerchief and two or three other little articles were taken from his front pockets and in his hip pocket they found the neck of a whisky bottle, the bottle was broken. I smelled that piece of the bottle and it smelled of whisky;" and "there was an odor of whisky about the body and the bottle was taken off the body." Kurth stated that "while the deputy coroner was searching the body I noticed the smell of liquor, the smell of alcohol" and "the neck of a whisky bottle lying on the ground beside the body." Dr. Hall, the deputy coroner who performed the autopsy, testified, on direct examination: "The stomach was loaded with undigested food and there was an odor of alcohol about the body . . . I could get a trace of alcohol. I did not make a chemical analysis so I could not say there was alcohol in the stomach. There was an odor that made me form an opinion that there was alcohol to a certain degree in the stomach." The written report of the autopsy which Dr. Hall made stated: "Alcohol in the stomach." On cross-examination the witness gave an opinion and made a statement of finding as follows: "If sufficient alcohol had been taken into the system shortly before death to cause intoxication at the time of death the stomach lining would have been red and inflamed but I did not find anything of that character at all." We quote that portion of McCormack's testimony relating to this matter in question and answer form. Direct Examination: "Q. Just before you made that movement (the switching movement in which Hancock was killed) had Mr. Hancock been on the footboard there at the east end of the engine with you? A. Yes sir. Q. Mr. McCormack did you see him take a drink there? A. Yes sir. Q. Did you protest against him taking a drink? A. Not

at that time. Q. What do you mean by that? A. I meant that I never said anything to him at that time about drinking. Q. Had you on other occasions?" Plaintiff's objection to the last question was sustained. Cross-Examination: "Q. Now Mr. McCormack you say that you saw Mr. Hancock take a drink that day? A. Yes. Q. How many? A. One. Q. How long was that before his death? Probably seven to eight or ten minutes. Q. Now, I want you to tell the court and jury whether he appeared to be sober before that? A. I couldn't state whether he was or not. I didn't talk to him before that. Q. He was riding down on the footboard with you wasn't he? A. Yes, but I never said a word to him or he to me. Q. You saw him in the performance of his duties there in switching operations for an hour at least? A. Yes. Q. Do you want to tell the court and jury whether he was sober before he took this drink you saw him take, or not? A. I don't know whether he was under the influence of liquor or not before he took the drink." Plaintiff made no objection to the competency of the foregoing evidence introduced by defendant.

We must now, of necessity, quote *verbatim* the portions of the opening argument of plaintiff's counsel to the jury of which appellant complains. The first part of the alleged prejudicial argument is directed to the question of damages to be awarded in the event the jury finds for plaintiff. Plaintiff's counsel stated: "The question that you gentlemen will have to decide is was this man killed in whole or in part on account of the negligence of this company and its employees. . . . Under the Federal Liability Act a man can no longer be sent away from court penniless even though he were careless in the performance of his duty and his conduct contributed to the casualty; no longer, under the Federal Liability Act, can a widow and orphan be returned penniless from the courtroom on the plea of a defendant that the dead man had something to do with the casualty which cost his life in the service of his employer. It is not on you gentlemen to say that in absolute discretion we shall give this amount or that amount. It is your duty beyond any question of discretion under this instruction if you return a verdict for the plaintiff to bring in the full amount in the case, the full loss that this woman suffered, loss, gentlemen, not only for the wages he would have earned throughout his expectancy, but as well loss for the services that a loving and devoted husband and father would render to his wife and child, so that in this case it isn't a question of disagreeing on an amount. As I shall show to you when I get to that issue, the very minimum which you are required to return under the mandatory provisions of this act, in the event you find this company wholly responsible for this man's death, is the minimum of $50,000 which we are asking."

"Mr. Lathrop: Now, wait a minute. I object to that as improper argument. There is no such law, and it is not a proper statement of the law. There is no provision in the act that requires the jury to

return a verdict for any specific minimum amount, and I object to the argument and ask that the jury be instructed to disregard it.

"THE COURT: Be so ordered. Gentlemen, you will follow the instructions of the court and be governed by the instructions covering the law in the case.

"MR. MADDEN: The Act declares that full damages shall be awarded, gentlemen, except in one contingency, to which I shall advert, and it is not for you to reduce those damages a single penny except for the sole contingency provided in that Act, which is that if the man himself shall have been guilty of some contributory negligence which resulted in his death, then the full damages shall be reduced to the extent that his negligence bears to the entire negligence attributable to both the deceased and the defendant.

"MR. LATHROP: I object to that statement; that is not the Act. The law is determined by the Court in instructions—. . . I object to that argument, and ask that the Court reprimand counsel for making improper argument, and I ask that the jury be instructed to disregard it.

"THE COURT: The objection will be sustained. The jury will follow the instructions.

"MR. MADDEN: All right. Gentlemen, you will have the instructions, and I will ask you to read the instructions and then you will find the provision that I have adverted to, and you will find it under instruction number IV written in language which is too plain for any sophistry of counsel to detract—

"MR. LATHROP (interrupting): Just a minute. I object to that comment of counsel as unfair. I am making objections for the record, which I have a perfect right to do."

"THE COURT: That is correct.

"MR. LATHROP: And I object to that statement, for the reason that it is made solely for the purpose of arousing the passion and prejudice of the jury against the defendant, and I ask that the Court reprimand counsel for making the statement, and that the jury be instructed to disregard it.

"THE COURT: Be sustained. The jury will follow the instructions."

Mr. Madden continuing his opening argument to the jury on behalf of plaintiff:

"The next defense he relied on was that Hancock was drunk, and I will discuss that; his own employees disproved it. . . . He knew that if Hancock was hopelessly drunk Mr. McCormack's testimony as to the way he fell would be entirely opposed to the physical facts, but when every witness testified he was not intoxicated, when even McCormack declined to say that he was under the influence of whisky on the stand—what difference does it make whether he had a drink ten minutes before or ten hours before, if that man was sober what difference does it make? It didn't affect his actions if every

witness says he was sober, but he hopes and prays there will be a lurking prejudice in the mind of some juror in this case that will inflame him against the widow and the orphan of the dead man if he can prove that the dead man owes his life to a single drink. That is the vileness of the charge he made; he didn't make it without knowing he could not support it. He knew before these witnesses went on the stand that every member of his crew would say that Hancock was sober, that they saw no evidence whatever of intoxication upon him. He knew the coroner would say that he did not smell whisky, he only testified to alcohol, and if he had taken a drink of whisky ten minutes before his death he would have smelled whisky, not alcohol, and yet in spite of that he was willing to blacken the memory of a dead man—

"MR. LATHROP (interrupting): Wait a minute.

"MR. MADDEN: —and the dead man's widow and orphan by—

"MR. LATHROP (interrupting): Wait a minute, I object to that statement as highly improper.

"THE COURT: Yes, be sustained.

"MR. LATHROP: On the ground it is made simply to arouse the passion and prejudice of the jury. I tried to bring the facts in here as I knew them, and I think the court should reprimand counsel for making that statement.

"THE COURT: The statement was improper and the jury will be instructed to disregard that statement.

"MR. MADDEN: I say to you gentlemen—

"MR. LATHROP (interrupting): Now, wait a minute.

"THE COURT: Come up here."

Whereupon the following proceedings were had out of the presence and hearing of the jury:

"MR. LATHROP: I object to the prejudicial argument of counsel repeated in spite of the sustaining of various objections by the court. I have tried to make objections where I thought they were proper, but counsel persists in making these statements, and in spite of the repeated sustaining of objections by the court for that reason I move that the court now discharge the jury from further consideration of this case.

"THE COURT: Well, be overruled.

"To which action and ruling of the court the defendant then and there at the time duly excepted and still excepts. . . .

"MR. MADDEN (continuing opening argument): I say to you, gentlemen, that to make a charge like that when you know it is not true, and when you know the evidence will not support it is a damnable thing.

"MR. LATHROP: Now, wait a minute, I object to that statement and say again that it is made simply for the purpose of prejudicing the

jury, and ask that the court reprimand counsel for making the statement, and instruct the jury to disregard it.

"THE COURT: Be sustained. Gentlemen, you will be governed by the evidence in the case, and not by anything the lawyers may say in their closing arguments.

"MR. LATHROP: I renew my motion to discharge the jury.

"THE COURT: Overruled.

"To which action and ruling of the court the defendant then and there at the time duly excepted and still excepts.

"MR. MADDEN (continuing opening argument): I challenge counsel now before this jury when he shall reply to me, when every witness in this case says that this man was not intoxicated, when every member of his crew denies that this man was intoxicated, when a deputy coroner of Jackson County says that he could not have been intoxicated, when every living witness upon this stand throws the charge of falsehood into his teeth when he says this man was drunk, I ask him whether or not he is still going before this jury with that same assault on the memory of this dead man, if he is still going to say this man was drunk, when his own evidence disproves it. Is that the defense that he proposes to rely on in this case? I say to him that challenge should be answered in this case by the tender not only of his apologies to the widow—

"MR. LATHROP (interrupting): Wait a minute.

"MR. MADDEN (continuing):—but his apologies to the memory of the dead man who went down to his death under the wheels—

"MR. LATHROP (interrupting): Wait a minute.

"THE COURT: Just a minute.

"MR. LATHROP: I object to that as improper argument, made solely for the purpose of prejudicing the jury.

"THE COURT: Be sustained.

"MR. LATHROP: And I ask that the jury be instructed to disregard it as improper argument.

"THE COURT: So ordered.

"MR. LATHROP: And in view of this repeated argument along that line I ask that the court discharge this jury.

"THE COURT: Overruled.

"To which action and ruling of the court the defendant then and there at the time duly excepted and still excepts.

"THE COURT: But the jury will be instructed to disregard the statement."

Plaintiff's counsel in his opening argument to the jury first gives attention to the question of damages and purports to discuss the instruction on damages. He tells the jury in effect that if they find for plaintiff that it is their duty under the instruction "to bring in the full amount in the case," and it is later made plain that thereby

counsel referred to the amount sued for, $50,000; and in this connection counsel tells the jury, in substance, that, under the instruction, they have no discretion as to the amount to be allowed plaintiff as damages. We have heretofore observed that the damages recoverable, in this kind of an action, are "such pecuniary benefits as the beneficiaries reasonably might have received had the deceased not died from his injuries." Chicago, B. & Q. Railroad Co. v. Kelley, 74 Fed. (2d) 80, 84. It is the duty of the jury to weigh and consider the various elements of damages in evidence and, in the exercise of their best judgment and discretion, based upon the facts of each case, determine and assess the pecuniary loss sustained by the beneficiaries. They are invested with that discretion and the instruction does not in any wise deprive them of it. Counsel next tells the jury that plaintiff is entitled to recover "the wages he (deceased) would have earned throughout his expectancy." The vice of this last statement is that it tells the jury they are not limited to the actual pecuniary loss of the beneficiaries but may assess damages on the basis of what deceased might have earned, the total of his earnings, "throughout his expectancy." [Chicago, B. & Q. Railroad Co. v. Kelley, supra.] Counsel then leaves off his discussion of the instruction and purports to advise the jury as to the provisions and requirements of the Employers' Liability Act relative to damages telling them, "the very minimum" they are "required to return under the mandatory provisions" of the act in the event they find "this company wholly responsible for this man's death is the minimum of $50,000 which we are asking." At this point defendant's counsel objected. The court sustained the objection and said: "Gentlemen you will follow the instructions of the court and be governed by the instructions." It was improper for counsel to undertake to construe the act or advise the jury as to its provisions. The law of the case was to be found in the instructions of the court. The act merely provides that in case of the death of an employee, within the provisions of the act, the defendant carrier "shall be liable in damages" to the personal representative for the benefit of the persons designated; no minimum or maximum amount is fixed nor do any provisions of the act make it mandatory upon the jury to return as counsel says "the minimum of $50,000 which we are asking." As we understand the amount sued for represented the maximum plaintiff was asking. The statements to the jury above noted are not only erroneous but calculated to be misleading. It is not likely that the mere direction of the court to the jury "to follow the instructions" sufficed to correct or remove the impression the statements conveyed. By a unanimous verdict the jury found for plaintiff in the sum of $50,000, the amount asked in plaintiff's petition. There was no basis in the evidence for such a verdict. It went far beyond the evidence, was grossly in excess of

any amount warranted by the evidence, and is not explainable except on the ground of a misunderstanding by the jury of the principles governing damages or passion and prejudice on the part of the jury against defendant prompting them to assess the full amount asked by plaintiff's petition in the nature of punitive action.

If the foregoing constituted the limit of counsel's transgression in his opening argument to the jury in view of the fact that no request was at the time made for further or other action on the part of the trial court and that the erroneous argument went alone to the question of damages we would perhaps be justified in endeavoring to correct the matter by considering appellant's alternative assignment that the judgment even after the *remittitur* required by the trial court is still excessive, but plaintiff's counsel, as appears from the argument set out above, turned to another phase of the case which bears in a somewhat direct way on the question of liability and disregarding the repeated ruling of the trial court and departing from the record persisted in a highly inflammatory argument calculated to stir resentment against defendant's counsel and arouse the passion and prejudice of the jury against defendant.

 This was a close case on liability. The jury was required to choose between the conflicting version of plaintiff's sole eyewitness Reinhardt and defendant's sole witness McCormack. If the jury believed Reinhardt, and that the casualty occurred as he related, defendant would be liable. As we noted, supra, defendant adduced substantial evidence tending to show that Reinhardt was not present at the scene of death but at the time was delivering an electric refrigerator in Kansas City, Kansas. On the other hand if the jury believed McCormack's version, that he did not move from his position next to the drawbar and that Hancock fell in attempting to get on the footboard "apparently" missing the "grabiron," defendant was not liable. No one so far as this record shows, neither counsel for defendant nor any witness in the case, stated, charged or claimed, that Hancock was drunk. On the part of defendant, McCormack testified merely that he saw Hancock take a drink of whisky about eight or ten minutes before he fell; two police officers testified to the odor of whisky about the body and the broken whisky bottle; the deputy coroner reported alcohol in the stomach; and the engineer called as a witness for plaintiff, on cross-examination, testified that when he went under the tank he noticed the smell of whisky about the body. Plaintiff made no objection to any of this evidence, conceding its competency. Defendant evidently went on the theory that whisky even in small quantities may tend to affect one's alertness, sense of timing and balance, that at least such are the reactions in many instances, and offered this evidence as a circumstance, for what it was worth, bearing upon its explanation of the casualty, that is,

that in attempting to get on the footboard Hancock "missed the grabiron" and fell under the tank wheels. Nevertheless counsel for plaintiff in his opening argument to the jury, when what he said was not in reply to anything said or charged by defendant's counsel, stated, that defendant's counsel "relied on the defense Hancock was drunk;" that he (defendant's counsel) was seeking to inflame the jury "against the widow and orphan of the dead man;" that the charge defendant's counsel makes is vile; that defendant's counsel charged Hancock with being drunk "knowing he could not support it" but "in spite of that was willing to blacken the memory of a dead man—and the dead man's widow and orphan;" and that defendant's counsel did a "damnable thing." Continuing plaintiff's counsel speaks of defendant's counsel as having "made an assault on the memory of a dead man" and, in effect, declares that the only honorable thing that defendant's counsel can do is to tender "apologies to the widow and to the memory of the dead man." Since the most that defendant's counsel had done was to introduce evidence tending to show that Hancock had taken a drink of whisky shortly before he fell, that there was an odor of whisky about the body, a broken whisky bottle in his pocket and alcohol in his stomach, the impression the argument of plaintiff's counsel impliedly, at least, must have conveyed was that defendant's counsel in presenting such evidence, though admitted by court without objection by plaintiff (and conceded by plaintiff to be competent), made a vile charge against a dead man; that he sought thereby "to blacken the memory of a dead man" and "blacken the widow and orphan;" that it was "a damnable thing" for defendant's counsel to do; and that for doing so defendant's counsel should apologize to the widow and orphan and the memory of the dead man. Plaintiff's counsel persisted in the inflammatory and vitrolic denunciation of the course pursued by defendant's counsel in the case despite the numerous and repeated objections which the trial court sustained. Disregarding the court's rulings plaintiff's counsel continued the same course of argument, without reprimand being made, multiplying the error and adding potency to the poison. We recognize that the trial court must be accorded a considerable discretion in handling incidents arising during a trial and we are not inclined to reverse a case on the ground of improper and prejudicial argument alone unless it clearly appears that the argument complained of must have resulted in actual harm or prejudice to the appellant. We know that in the stress and strain of a sharply contested trial counsel's zeal and intensity ofttimes leads to inadvertencies and slight transgressions beyond the limits of fair argument or statement but when the trial court does not consider such instances sufficient to require a new trial we are inclined to defer to its opinion in the matter unless upon full examination of the record, as in this instance, it appears that the

improper argument or statement was so prejudicial, inflammatory and outside the record as to have affected the result on the merits. We further recognize that counsel is entitled to a wide latitude in the argument of his case to the jury, in discussing the facts in evidence and making deductions therefrom, and in weighing the evidence and the credibility of witnesses. "Counsel have the right, in the interest of their clients, to argue to the jury, untrammeled by fear, unmolested by courts, and uninterrupted by opposing counsel, every fair inference deducible from the evidence that has been developed during the progress of the trial, for or against his client." [Gidionsen v. Union Depot Ry. Co., 129 Mo. 392, 393, 31 S. W. 800.] Here counsel was not discussing the weight of the evidence, the credibility of the witnesses, or the fair inferences deducible from the evidence nor were the inflammatory statements mere inadvertences, chance overstatement or a casual excess of zeal which might be considered cured by prompt apology or withdrawal by counsel or reprimand or other appropriate action by the trial court. The statements were made and pursued, repeated and reiterated in spite of and in disregard of the court's rulings. Nor did the perfunctory rulings of the court, without reprimand or strict enforcement, suffice as an antidote to the poison thus injected into the case. The prejudicial argument of counsel for plaintiff, so persisted in, relative to the action of defendant's counsel and his conduct of the case coupled with the erroneous argument in reference to damages is undoubtedly reflected in the unwarranted verdict for $50,000, the full amount sued for. The record discloses no other explanation for such a verdict. We must therefore reverse the judgment and remand the cause. It is so ordered. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by Ferguson, C., is adopted as the opinion of the court. All the judges concur.