WILLIAM DEES v. SKRAINKA CONSTRUCTION COMPANY, Appellant.—
8 S. W. (2d) 873.

Division Two, July 20, 1928.

840

*Fordyce, Holliday & White* for appellant.

*Mark D. Eagleton* and *Hensley, Allen & Marsalek* for respondent.

HENWOOD, C.—This is an action for damages, filed in the Circuit Court of the City of St. Louis, in which William Dees, as plaintiff, alleges the negligence of defendant as the cause of personal injuries suffered by him while employed by defendant. The trial resulted in a verdict and judgment for plaintiff in the sum of $17,500. The trial court held that the amount of damages awarded by the jury was excessive, but overruled the defendant's motion for a new trial upon the condition that plaintiff remit the sum of $8500. Such *remittitur* was made by plaintiff, and a new judgment entered in his favor for $9000. From that judgment, defendant prosecutes this appeal.

The evidence offered by the plaintiff shows that, at the time in question, plaintiff was forty-two years of age, and that he had been employed by defendant for about six weeks as fireman of one of defendant's concrete mixers, for wages in the sum of $25 per week. The concrete mixer was a heavy iron machine operated by steam, resting on four iron wheels, with flanges about six inches in width. It consisted of a fire-box, boiler, and other steam engine equipments, a mixer, a large iron bowl or pan, at the front end, by which the materials for the concrete were received at the ground and carried to the mixer, and an iron bucket or spreader, at the rear end, by which the concrete was taken from the mixer and poured at the place desired. The material bowl or pan was raised and lowered by means of hoisting apparatus connected with the engine, and the bucket or concrete spreader was moved about by means of its connection with a sliding device on an iron beam which extended outwardly from the rear of the machine. When the plaintiff was hurt, about eleven o'clock in the morning of May 15, 1924, this machine was being used by defendant in paving a public alley in the northwest section of the city of St. Louis. On this job, the concrete was poured over a space of sixteen feet between movements of the machine, and the machine was moved, for this purpose, on an average of once every hour. The machine was headed toward the east and its movements were made in that direction, on heavy boards which were laid in the form of tracks for its wheels. The water supply for the boiler and mixer was provided by a hose connection between the machine and a water plug located about 300 feet south and a little east of the machine. The hose attachment on the machine was on the left side, between the boiler and the mixer, and in front of and above the left rear wheel.

Immediately prior to the movement of the machine which caused plaintiff's injuries, the hose extended from the water plug, at a point about 300 feet away, on the right or south side of the machine, around the back part of the machine, to its connection on the left or north side of the machine, and a slacked portion of the hose was on the ground in front of the left rear wheel. The plaintiff was hired to work for defendant by Martin Gavin, the engineer in charge of the operation of the concrete mixer, and was subject to his orders and directions. Plaintiff's duties consisted of firing the engine, keeping water in the boiler, moving and placing the boards for the left wheels of the machine, and handling the water hose on the left side of the machine. When the machine was moved, the hopper man (George Collins) handled the hose on the right or south side, and it was plaintiff's duty to pick up the hose on the left or north side, and carry it along as the machine moved and keep it from getting under the left rear wheel.

The plaintiff testified that the engineer told him to move the hose, and that, while he was in the act of doing so, the engineer started the machine immediately, without signal or warning to him, and thereby caused the left rear wheel of the machine to run over his right foot. In this connection, plaintiff said: "Well, he told me to move the hose. I was standing by the machine. I started to move it, and he started the engine, and caused my injuries. I had just gotten hold of the hose to move it, and as I got hold he started up, and I had to pull the hose out of the way of the wheel, and the concrete was on it, and that caused it to pull me right under the wheel, by him starting so quick. It jerked me right under and ran over my foot." On cross-examination, the plaintiff further said: "He looked under and told me to move the hose, and then he never give me no signal that he was going to move, and I thought he was waiting on me a minute or so to give me a chance to, get the hose out of the way." The plaintiff further testified that, prior to this occurrence, the engineer would "sometimes" give him a warning before moving the machine and "sometimes" he would not; that, twice before this occasion, he complained to the engineer about starting the machine without giving any warning, and the engineer said he would give him "plenty of time to get out of the way." Referring to these complaints, on cross-examination, the plaintiff said he told the engineer "that he was reckless and that somebody was going to get hurt," but admitted that the engineer had never hurt anyone else, as far as he knew.

Ira Craig, formerly employed by defendant, as fireman, and as "boss of the loading pan," testified that, on numerous occasions,

"sometimes twice a day," the engineer (Martin Gavin) started the machine without warning to the fireman, and without giving the fireman time to get the hose out of the way; and that, on numerous occasions, the engineer (Martin Gavin) hoisted the "loading pan" before he received the customary signal to do so, causing the men engaged in loading the pan to be thrown on their backs, and causing the wheel barrows used by these men to be taken up in the pan "to the top of the lift." He admitted, on cross-examination, that he had seen "no other man run over by the machine."

While testifying concerning his injuries, the plaintiff removed his shoe and sock and exhibited his right foot to the court and jury. He said the three missing toes, the three outside toes, were amputated about a week after the accident, and that the incision and depression on the right side of his foot was the result of a second operation, when a piece of the bone on that side of his foot, about four inches long, was removed; that he suffered "awful pains all over the foot," following the accident and the operations, and that he had been "free from pain but little of the time" since he was hurt; that he was in the hospital about three and a half months, and that he was using a crutch at the time of the trial nearly a year after the accident; that he had not been able to walk on his injured foot until about a month before the trial, and that, when he did walk on it, it became sore and swollen and made the pain in his foot more severe; that he had not worked "a minute," nor earned "a penny" in wages, since the day he was injured; and that his right foot was "in fine shape" before this accident.

Dr. Geo. T. Meehan, who examined plaintiff's foot on the day of the trial, testified as follows:

"Q. Tell us what you found? A. The patient presented himself for examination, and complained of an injury suffered to the right foot. On examination of the lower extremity there I found that there was some atrophic change in the lower leg, that is, by actual comparison with the left. The ankle was fairly movable. There was no obstruction to the movement that I found to the ankle joint itself, but the foot presented a marked deformity, with absence of the fifth, fourth and third toes, with partial ankylosis of the second toe. There was a very definite scar on the dorsum of the foot, and on the top surface of the foot there was some very perceptible scar tissue, indicating some injury at that point, looked like little scars extending from a point at the third toe, up and laterally around to the midside of the foot and up above on the ankle to the external maleolus. There was an absence of the fifth, fourth and third toes, with partial ankylosis of the second. There was some tenderness and some pain exhibited on deep pressure over the third metatarsal bone and also

over the metatarsal joints, indicating some contusion or injury to the foot.

"Q. Now, Doctor, I will ask you, from a surgical and medical standpoint what would you say as to the functional disability of that foot? A. Well, from the complete loss of three of the digits or toes, together with the injury to the tarsal bones of the foot, plus the changes that have taken place in the leg, the atrophic changes, I would judge there was at least sixty or seventy per cent loss of use of that foot.

"Q. Would you say that this injury, all those injuries you have described to the jury, are of permanent character? A. Yes, sir.

"Q. Are they of a kind that will cause pain? A. Usually do, yes, sir.

"Q. And would you say that disability is a permanent disability? A. Due to the absence of some of the members of the foot, yes."

The following is taken from the cross-examination of this witness:

"Q. What do you say as to how the weight is carried? A. I think the weight of the body is carried in the form of a tripod, with the heel acting as one, the inner and external metatarsal phalangeal joints, the first and fifth, acting as the others, also in connection with the tripod the weight is also distributed down along the arch, the small arch of the foot, between the fifth and first toes.

"Q. So that in this case you have two of these intact, haven't you? A. Two of what intact?

"Q. Two of the points of the tripod? A. Yes, sir, but this extends through the point, the outer upward point of the tripod, which leaves this portion here (tapping foot) insufficiently provided for.

"Q. But the ball of the foot is still there, isn't it, the big toe isn't missing? A. No, but the phalanx, the tarsal phalanx of the toe, the five metatarsal bones forms the complete tripod, the third part of the tripod."

On the defendant's side, Louis Skrainka, president, and Walter Skrainka, superintendent, of the company, testified that they had never heard of an accident caused by their engineer, Martin Gavin, nor of anyone being hurt by him around the concrete mixer.

Keppler, an employee, said he heard the engineer tell the hopper man he was ready to move, and saw the hopper man tell the plaintiff they were going to move; that, after the hopper man gave the engineer the signal to move, the plaintiff had "a lot of time" to remove the hose before the machine was moved; that the plaintiff was crouched down over the left rear wheel for two or three minutes before the machine was moved, with the hose in his right hand and his foot under the wheel; and that he "hollered" to the plaintiff to

get his foot out of the way, and the plaintiff "stood there like he was asleep."

Brown, another employee, on direct examination, said: "He [the plaintiff] had the hose on the wheel, and he had his hands on the hose, pulling at the hose when the mixer started up." On cross-examination, he said: "I don't know whether he was pulling at the hose or not, but he had the hose in his hands resting it on the wheel up there."

Collins, the hopper man, testified that, after notifying the plaintiff the machine was ready to move, he gave the plaintiff three or four minutes to attend to his hose before giving the engineer the signal to move. On cross-examination, he admitted that he was on the opposite side of the machine, and could not see the plaintiff, at the time he signaled the engineer to move.

Martin Gavin, the engineer, said he had worked for the defendant sixteen or seventeen years, and had charge of the concrete mixer for ten years; that it was the hopper man's duty to give him the signal to move, "always seeing that the fireman got back there to take care of the water hose;" that, after he got the signal to come ahead, he waited "maybe two or three minutes, probably four minutes, ample time for him to get his hose," before he started the machine. He further said that he had never had an accident around the machine, and that nobody had even spoken to him about being hurt by his moving the machine forward, or anything like that.

Dr. Leo A. Will gave the following testimony, concerning his examination of the plaintiff's foot:

"Q. Doctor, I wish you would tell the jury what your examination consisted of, and what you found? A. My examination consisted of taking the history of his accident and of his present complaints, and the examination of his lower extremities, together with the taking of radiographs of his feet and ankles.

"Q. With particular reference to the right ankle, will you tell the jury—right ankle and foot—will you tell the jury what you found, Doctor? A. He had a crushing injury to his right foot that necessitated the removal of the three outer toes, together with the fifth metatarsal bone, that is the outer bone, and the long bone of the foot. In the great toe on the right foot there was some remaining stiffness, and also some disturbance of the second toe.

"Q. Now, with reference to the ankle, were you able to manipulate the ankle? A. Yes, sir; I found the movement of both ankle joints to be free and equal.

"Q. Nothing wrong with his ankle? A. No, sir.

"Q. Now, in examining his foot, were you able to form an opinion as to the extent of the disability he had in that right foot? A. Yes, sir.

"Q. What about the arch of the foot? A. There was nothing noted about the arch of the foot except some thickening through the arch, with some slight redness over the arch of the foot, the right foot.

"Q. Now, I believe you were able to form an estimate of the degree, or amount of loss of function in that foot? A. Yes, sir.

"Q. Will you tell the jury what, in your judgment, this man has suffered so far as loss, that is, what percentage of loss he has sustained in that foot? A. At the time I made the examination I figured about a twenty-five per cent loss of function would be a fair estimate.

"Q. Where is most of the weight borne, Doctor, when one walks, relative to the points of the foot? A. On the inner side of the foot, especially at the base of the great toe, and along the inner side of the foot, the inner half."

Counsel for defendant now ask a reversal of the judgment and a remanding of the cause for another trial, on two grounds only: first, they urge that the trial court erred in permitting plaintiff's counsel to make improper, prejudicial and inflammatory remarks to the jury in his opening statement of the case; second, they insist that the judgment is still excessive, notwithstanding the *remittitur* made by plaintiff, and that the verdict resulted from passion and prejudice on the part of the jury.

I. As to the portions of the opening statement of plaintiff's counsel complained of, and the objections made thereto, the record shows the following:

"MR. EAGLETON: Now, the evidence will show that it was necessary for the plaintiff to be near this wheel in order to carry out the instructions of the engineer, and this engineer was the kind of a fellow who had done this kind of work before; *in fact, I think the evidence will show this was not the first foot he went over*—(Italics ours.)

"MR. CLARK (interrupting): I object to that, if the court please, and move that that be stricken from the record—

"MR. EAGLETON (interrupting): I think that is perfectly proper and in line with what I expect to show.

"MR. CLARK: And I now move that the jury be discharged and a mistrial declared.

"MR. WOODWARD: Such a statement as that couldn't be competent. They couldn't show that.

"MR. EAGLETON: That would be absolutely competent to show this man's competency, or, rather, his lack of competency.

"THE COURT: I will overrule the objection and refuse defendant's motion to discharge the jury.

"To which action and ruling of the court the defendant, by counsel, then and there duly excepted and still continues to except.

"MR. EAGLETON (continuing): *We will show you by the evidence that he had gone over another fireman's foot before this,* and that there had been complaints of the manner in which he handled that engine, and that the men who had worked there in the same position as Dees was working had asked him to be more careful in moving this mixer, to give them time to get out of the road. I think the evidence, without question, will show that this man has sustained a great injury and that his injury was due to the failure of this man Martin, who had done this same thing before, in starting this thing up without warning, when he was in a position of danger— without exercising any care to look for him, when he was right there where he could have been seen, and where the engineer knew his duties required him to be. (Italics ours.)

"MR. WOODWARD: At this time defendant again moves the court to discharge the jury for the reason that, over the objection of the defendant, plaintiff's counsel, in his opening statement, has been permitted to refer to a specific instance of an alleged prior accident, and that is immaterial under the pleadings as here framed and cannot help but be prejudicial and inflaming to the minds of the jury.

"THE COURT: Motion overruled.

"To which ruling of the court the defendant, by counsel, then and there duly excepted and still continues to except."

In addition to other specifications of negligence in his petition, the plaintiff alleges:

"1. That defendant negligently failed to exercise ordinary care to furnish plaintiff with a reasonably safe engineer and fellow-workman with whom and under whom to work, in that the said Martin frequently and habitually started and moved and caused to be started and moved said machine so as to be likely to cause injuries as aforesaid, and without giving any warning thereof, and he was incompetent and habitually negligent as aforesaid, and not reasonably safe, all of which defendant knew or by the exercise of ordinary care could have known in time to have avoided plaintiff's injuries."

As above shown, defendant objected to certain portions of plaintiff's opening statement, first, because such portions of the statement related to incompetent and immaterial evidence, and, second, because of the prejudicial and inflammatory effect of such portions of the statement on the minds of the jury. Having pleaded that defendant's engineer was incompetent and habitually negligent in handling the machine, and that defendant, with knowledge thereof,

had failed to exercise ordinary care to furnish a reasonably safe engineer for the machine, the facts and circumstances referred to by plaintiff's counsel, and to which defendant objected, were clearly competent and material as evidence on that issue. "In an action for injuries alleged to have resulted from the incompetency of a fellow-servant, it is held in a large majority of the states that evidence of prior specific acts of such servant indicating incompetency is admissible upon the question of his competency, even though such negligent acts differ somewhat from the negligent act which caused the injury, provided they are of similar character, where it is shown that such acts were known, or ought to have been known, to the employer, proof of actual notice to the employer or to his foreman not being required." [39 C. J. 1035.] "It was certainly the duty of the defendant to use reasonable care in selecting fit and competent persons to discharge the duties assigned to them. To show a want of such care, either in employing the servant or in retaining him, it is competent to put in evidence his general reputation of unfitness for the duties assigned to him. [Wood on M. & S., sec. 420.] And for a like purpose, specific acts of negligence or of incompetency, with evidence of knowledge thereof on the part of the master, may be put in evidence. [Wood on Mas. & Ser., sec. 432; Mich. Cent. Railroad v. Gilbert, 2 Am. & Eng. Railroad Cas. 233.]" [Grube v. Ry. Co., 98 Mo. 330, 339, 11 S. W. 736.] Evidence of that character being admissible under the pleadings, the trial court properly ruled that the references made thereto by counsel in his opening statement were not prejudicial.

And now, in this court, the further complaint is made that plaintiff made no effort to prove that, prior to the accident in which he was injured, similar accidents and injuries to other employees had been caused by the negligence of defendant's engineer, and that the assertions of plaintiff's counsel to that effect, in his opening statement, were made only for the purpose of arousing a feeling of prejudice in the minds of the jury against the defendant. It is true that the plaintiff failed to support these particular assertions with proof. But, it does appear from the testimony of plaintiff that, on two different occasions before he was injured, he complained to the engineer about starting the machine without any warning, while he (the plaintiff) was in a position of danger. And it also appears, from the testimony of Ira Craig, a former employee of defendant, that the engineer frequently started the machine without giving the fireman time to attend to the water hose, and without warning, and that the engineer often hoisted the "loading pan" prematurely and without warning, and thereby caused the men there engaged to be thrown on their backs, and the wheelbarrows used for loading purposes to be

taken up in the pan. In view of this showing as to the habitual negligence of the engineer in handling the machine, it would be hardly fair and reasonable to say that plaintiff's counsel was guilty of bad faith in overstating his case. It is rather a common occurrence for litigants and their counsel to fall short of their expectations in the matter of available evidence, and, if verdicts could be set aside and judgments reversed on the ground that counsel overestimated their proof, in their opening statements, not many verdicts and judgments would stand the test. Trial courts must necessarily rely upon the good faith of counsel in making their opening statements to the jury, as to material facts and circumstances which they expect to prove. [2 Hyatt on Trials, p. 1540.] In this instance, the references made by plaintiff's counsel, in his opening statement to previous accidents and injuries to other employees, related to competent evidence, and, for that reason, defendant's objections thereto were properly overruled. When it appeared that the evidence did not fully substantiate such assertions of counsel, the defendant should have requested the court to instruct the jury to disregard the same, if it was then considered that the defendant might be prejudiced thereby. Having failed to request such an instruction, the defendant is not in a position now to complain of the manner in which the trial was conducted, in this particular. In the absence of a cautionary instruction, it was for the trial court to say, in the exercise of its discretion, whether or not the defendant was prejudiced by the opening statement of plaintiff's counsel, and it is our conclusion that the trial court did not abuse its discretion in overruling defendant's motion for a new trial, on that ground.

II. We come now to the contention that the judgment is still excessive, notwithstanding the *remittitur* made below, and, in this connection, the further contention that the jury were moved by passion and prejudice in rendering their verdict.

At the time of this accident, the plaintiff was forty-two years of age, and was earning $25 per week, or approximately $1300 per year. In the two operations that followed, he suffered the loss of the three outside toes and the fifth metatarsal bone, or the long bone, of the right foot. According to the testimony of examining physicians. there was "some remaining stiffness" in the great toe, "some disturbance," or "partial ankylosis," of the second toe, "some thickening through the arch" of the foot, and "some atrophic change in lower leg," at the time of the trial, nearly a year after the accident. It further appears that plaintiff's foot is permanently crippled and deformed, and that its use, strength and activity are permanently

impaired. Dr. Meehan testified: "I would judge there was at least sixty to seventy per cent loss of use of that foot." Dr. Will said: "At the time I made the examination I figured about a twenty-five per cent loss of function would be a fair estimate." The plaintiff suffered severe pain following the accident and the operations, and continued to suffer some pain from his foot at the time of the trial. He was in the hospital for three and a half months, and was still using a crutch at the time of the trial. In walking by the aid of a crutch, he first placed his foot on the ground about a month before the trial, and such use of his foot, at that time, caused it to become sore and swollen, and to be more painful. The plaintiff was unable to work or to earn any money during the year intervening between the accident and the trial. As to what has happened since, in his ability to work and his earning capacity, we, of course, are not advised. The condition of his foot at the time of the trial would indicate that he was unable to work for a considerable length of time thereafter, and, considering his age, the nature and extent of his injuries, the character of his employment, and his general situation in life, it seems fair to conclude that his earning capacity has been materially reduced.

This court has always been conservative in the matter of measuring damages for personal injuries, and its course has proven both wise and just. But, recognizing the steadily increasing cost of living to the average citizen, and the lessened purchasing power of money, it has, in recent years, given its sanction and approval to more liberal awards than in the past. What is a fair compensation for plaintiff's injuries? After a very careful study of this question, we are unwilling to say that $9000 is too much. And, in this conclusion, we are supported by numerous recent decisions, in cases somewhat similar in facts and figures. [Spencer v. Railroad Co. (Mo. Sup.), 297 S. W. 353; Schlueter v. Ry. Co. (Mo. Sup.), 296 S. W. 105; Jordan v. Ry. Co., 308 Mo. 31, 271 S. W. 997; Lackey v. Ry. Co., 305 Mo. 260, 264 S. W. 807; Ernst v. Ry. Co. (Mo. Sup.), 256 S. W. 222.]

The argument that the jury's verdict shows passion and prejudice is not persuasive. No complaint is made as to the admission or exclusion of evidence or as to the instructions given to the jury, and the record fails to disclose any misconduct on their part. Juries have nothing except their ordinary experience as laymen to guide them in estimating damages in cases of this character. Indeed, our trial and appellate courts are not much better off in many instances. And this court has repeatedly held that an excessive verdict does not necessarily indicate improper motives on the part of the jury, and that where, as in this case, there is no substantial basis for the charge

of passion and prejudice, and the plaintiff consents to a reasonable *remittitur*, the defendant cannot justly complain, even though the judgment is based upon an excessive verdict. [Russell v. Railroad Co. (Mo. Sup.), 295 S. W. 102, 104; Sperry v. Hurd, 267 Mo. 628, 643, 185 S. W. 170; Clifton v. Ry. Co., 232 Mo. 708, 715, 135 S. W. 40; Cook v. Globe Printing Co., 227 Mo. 471, 551, 127 S. W. 332; Moore v. Transit Co., 226 Mo. 689, 706, 126 S. W. 1013.]

In accordance with our conclusions, in the premises, the judgment is affirmed. *Higbee* and *Davis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.