## BAKER

v.

## ST. LOUIS PUBLIC SERVICE CO.

No. 43458.

Supreme Court of Missouri.
En Banc.

June 14, 1954.

Mattingly, Boas & Richards, Lloyd E. Boas, Lester F. Stephens, St. Louis, for appellant.

Claude I. Bakewell, St. Louis, Mortimer A. Rosecan, St. Louis, Dyer, Boland, Gray & Dreher, Charles E. Gray, St. Louis, for plaintiff-respondent.

ELLISON, Judge.

The defendant-appellant, St. Louis Public Service Company, appeals from a verdict and judgment for $9,000 in favor of the plaintiff-respondent, Kades R. Baker, a woman 56 years old, for injuries allegedly sustained by her in St. Louis on December 29, 1949, in a collision between one of appellant's Cass Avenue busses traveling south on Eighth Street and an automobile at or near its intersection with O'Fallon Street. She was sitting on the right side of the front seat facing forward. She said she thought the bus was going fast, but was rendered unconscious by the collision and remembered nothing about it until she regained consciousness. A photograph, Exhibit C, shows the bus headed against the side of the automobile almost at a right angle, with the fender, hood and top of the latter badly dented and distorted.

Plaintiff's testimony was that on regaining consciousness she found herself lying completely on the floor. Other passengers were screaming and there was general confusion. One of her shoes had been thrown into the middle of the bus and her shoulder bag was missing. About half the people were on top of her and pressing her against an iron rod under the seat which was choking her. There were strong gasoline fumes and she was afraid they would ignite and the bus catch fire. After she had composed herself she went outside and stood with the other passengers.

She first thought about calling her husband, but did not do so and took a bus down town to a store, the Grand Leader, with the intention of telephoning her doctor. She was unable to reach him on two calls. After that she tried to shop in the store but didn't feel well enough, and then went home and again tried to contact her doctor, without success. She then walked over to her husband's business school a few blocks away, but they were unable to reach any doctor that evening and after a very miserable night suffering with pains in her head, arm, shoulder and leg she got in touch with her sister's physician the next morning and was sent to St. Luke's hospital.

There she remained 21 days as a bed patient. Her treatment was physical therapy and sedatives. She had pains in her head, leg, left arm and shoulder, back, lumbar region, chest, chin, knee and ankle. It was almost two weeks before that cleared up. She said she was highly nervous and

could not sleep. After leaving the hospital she returned once or twice a week as an outpatient for several months and received heat treatments and sedatives in capsules and hypodermics. She was very nervous, excitable and couldn't sleep.

At the time of the trial 2½ years after the casualty she said she was so nervous she couldn't stand it, took sedatives and didn't enjoy her family, or visiting other people. Her leg bothered her and was very sore. She felt like she was going to collapse and her hands would tremble and perspire. Her headaches were constant, at least every other day. She had never had headaches like that before. Previously she had assisted her husband at his business school, The Mound City College, but she had to give that up. It made her nervous to go to other people's houses. Her husband curtailed his business trips to be with her.

On cross-examination she said she didn't know how the collision between the bus and the automobile occurred. But she agreed that she remained at the scene of the casualty for a short time and took another bus down town, staying there until about 3:30 p. m., a period of over five hours, in the meantime shopping and buying a hat. She thought she got home about 4:30 p. m. After about five minutes she walked to her husband's school three blocks away, remained there a few minutes, and she and he returned to their home.

Prior to her injury she had worked at the school two nights a week, and registered students and interviewed prospects one day a week, and she contemplated going back to full time work in January. She had started her vacation in May. But she denied that she had quit because she was unable to work. She said she owned a third interest in the school, her husband the same, and it appears the remaining third interest was owned by another party. She conceded she didn't go to the school every day but she handled at home the employment of students. After the third party came into the business she didn't draw a steady salary. Before her injury on December 29, 1949, she was in good health except that she didn't drink enough water. But afterward and at the time of the trial her major complaint was soreness and sensitiveness of her left side, leg and back. Her nerves were worn, and she dreaded social engagements and clubs. She had a capable maid who did her housework.

The hospital records were produced by the hospital librarian. They showed that from January 1, 1950, two days after she entered the hospital, until January 21 when she left and became an outpatient she rested quietly and slept well, and had a good appetite, receiving such sedatives as amatol, aspirin and mild laxatives, heat treatments and baths at bedside during the first ten days. There is an entry in the hospital records for each of these 21 days showing the foregoing, substantially, except that it was noted she suffered from pruritus, or itching, and rash during the last two days.

On redirect examination it was shown that as an outpatient she took heat treatments on two days in January, five days in February, four days in March and two days in April, 1950, under the direction of her doctor. The entry on the date of her discharge as an inpatient on January 21 is: "Some improvement. Still complains of pain in shoulder occasionally." Respondent testified the heat treatments helped her some, but that her left arm and shoulder were still very sore; she couldn't sleep on her left side at all; to turn in bed she had to work her entire body around; and her left leg hurt her practically all the time.

Dr. Robert E. Britt was Mrs. Baker's expert witness. He specialized in the field of neurology and psychiatry. He was first consulted by her on November 5, 1951, about a year and ten months after the casualty and about the time her amended petition in this case was filed. She was examined at that time by Dr. Britt's associate, Dr. Baker, under the former's direction, and the two conferred thereon later. Dr. Britt saw her himself several times afterward, and she gave him a history of her case which was an essential part of the examination upon which he based his diagnosis of her condition.

He found her blood pressure was 166/100. and her pulse over 120. There was tenderness over the tenth thoracic vertebra and some diffuse tenderness or percussion over the skull which was not confined to any particular area. She thought her eyesight was diminished and her hearing less acute. Her digestion was upset by headaches. She complained of pains in the upper abdomen, loss of appetite, palpitation of the heart especially when excited, pain in the left arm, leg and shoulder and a "startle" reaction at unusual noises. He applied the Romberg and the finger-to-nose tests. Based on these tests the doctor expressed the opinion that the plaintiff suffered from a "traumatic neurosis" and exhibited a "postconcussion syndrome" of the brain caused by the collision of the bus and automobile, and that she would not get any better than she then was.

Counsel for the defendant-appellant moved for a mistrial on 22 grounds, one being that plaintiff's counsel had elicited from the doctor as an expert witness the statement that he believed the plaintiff was telling the truth when he examined her. Another was on the ground that the testimony invaded the province of the jury. Appellant's counsel further moved for a mistrial on the ground that the trial court had made a remark in the presence of the jury that the examination made by the witness, Dr. Britt and his associate Dr. Cecil Baker, was a *joint* examination.

It was shown that Dr. Britt was not present when Dr. Baker made the initial examination of the plaintiff and that he did not examine her heart though an electrocardiogram was made. But that, he said, had nothing to do with his testimony since the electro-cardiogram showed the heart normal. Also he did not take her blood pressure, then, but said that likewise had no bearing on a neurological examination, and for that reason an objection to his testimony as to blood pressure was sustained. Also he said the same as to distention of the arteries, and tremor of the tongue, though the latter is associated with a nervous state, as is also touching with a sharp object. She said the sensations on her right side and left side were different. Her reflexes were variable at one time from another. His conclusion from his examination was the plaintiff had a "postconcussion syndrome," or "traumatic neurosis." He said it was not necessary to lose consciousness to have the latter.

Dr. Louis Reuter, a specialist in traumatic surgery and examination of people that have been in accidents, was the defendant-appellant's expert witness. He examined the plaintiff on April 21, 1950, 4 months and 22 days after the casualty. He said she "complained of nervousness, of pain in her chest and back on raising her arms above her head, and also in turning over in bed, and she complained of pain in her chest if she would lie on her left side."

She was 5 feet 7 inches tall and weighed 135 pounds. He examined her head, eyes, nose, mouth, neck, abdomen and lower extremities, and found no deformities. Her blood pressure was 140/70 and her pulse 80 beats per minute. She had a midline scar on the abdomen from an operation in 1921. Examination of her back showed: "The spinal processes were in good alignment; there was no rigidity nor spasticity of the muscles. The patient would not move her back in any direction, stating that it hurt her; and, when pressure was made over the upper back she complained of pain. She also complained of pain when pressure was made over the left shoulder and chest. There was no discolored area over the left chest at this time." With reference to his statement that plaintiff would not move her back in any direction because it hurt her, the doctor testified that he "observed her getting in her automobile after she left my office, and she exhibited no difficulty in *getting in her automobile or in sitting down.*"

Continuing she said "there were no swellings, discoloration or other evidences of injury about the left elbow. There was no impairment of the normal movement of the left forearm on the elbow joint. All her sensory reflexes were present and normal, and the biceps, triceps, radial,

ulnar, knee-jerks were present and equal. There was no Rombergism. There was no tremor of the extended fingers. I X-rayed the thoracic back—that's the upper part of the back—and found no evidence of bone injury." Continuing he said she did not complain to him of having headaches at that time, and he did not find any objective findings that he could attribute to trauma or blow or injury."

The record in this case does not show when the plaintiff filed her original petition. The amended petition was filed on November 15, 1951. The defendant-appellant filed an answer which was amended by interlineation on June 11, 1952 after the trial had started. Five days before that on June 6, 1952 the plaintiff called on Dr. Reuter for another examination. That was nearly 2½ years after her injury, and over two years after the first examination. Her blood pressure then was 120/84 and her pulse 80. In other words her diastolic pressure was 20 points lower than on the first examination and her systolic pressure 14 points higher, with her pulse the same as before.

At that second examination the plaintiff complained of being unable to sleep on her left side; of pain in her left arm and shoulder; of soreness in the middle of her breastbone; of extreme nervousness; of being unable to concentrate on anything for any length of time; and of being very apprehensive. She said that if she took a walk when she got back she was a complete wreck and had to lie down for about two hours. She stated she became very upset very easily over trifling things, and of being unable to work as a secretary to the business school as the discussion of business upset her; and she complained of pain in her left leg.

Continuing Dr. Reuter said he found no abnormalities of her head, eyes, nose, mouth, abdomen, neck or back although the plaintiff complained as to her neck sometimes when she turned her head toward his left shoulder, or when pressure was applied to the sternum. She would raise her left arm only shoulder high. But when she was putting on her blouse she raised her arm. Also she complained of pain in her left leg following the casualty. An X-ray showed no bone injury to the sternum. A Romberg test disclosed all reflexes were the same. Plaintiff's counsel developed on cross-examination that the doctor rather specialized in a traumatic industrial practice —employed by insurance companies covering employees of factories. But he said he also engaged in private practice. He did not claim to specialize in the field of neurology or psychiatry, but thought he could qualify therein. And he said he found no evidence of traumatic neurosis.

A witness Mary Thurman was in the same seat with Mrs. Baker and was the only other eyewitness to the collision who testified to the casualty. She said the bus had stopped for the intersection and was going slow, but estimated the automobile's speed at 30 miles per hour. However she didn't actually see the collision, because she was watching a little girl on the other side of the car. She said the plaintiff, Mrs. Baker, slipped off the seat, and she (Mrs. Thurman) went clear to the floor on a second impact. When she got back in her seat Mrs. Baker had already resumed her seat. She didn't complain of pain, but asked if her nose was bleeding and Mrs. Thurman told her it was not. Both women got off the bus, and after standing around awhile Mrs. Baker said "I have to go. I have some shopping to do." Mrs. Thompson said Mrs. Baker took the next bus, and the two women took each other's name.

Mrs. Rosalie Hammer, a witness called by the defendant-appellant Public Service Company, had the apartment house in which the plaintiff-respondent Mrs. Baker and her husband occupied the second floor as subtenants from 1948 until May, 1950. Mrs. Hammer testified Mrs. Baker "started staying home" about June or July and told her it was on account of nervousness—that it made her nervous to work and that she "hasn't felt very good since the birth of her child," and occasionally she was "afraid". On December 29, 1949, the date

of the bus-automobile collision, she saw Mrs. Baker leave her apartment in the morning and return about 4:15 in the afternoon. She was carrying bundles which she took to her apartment and a few minutes later left. This accorded with Mrs. Baker's testimony that after the automobile-bus collision she went down town, purchased merchandise, returned home and then went to her husband's school. The witness further stated Mrs. Baker on several occasions failed to answer the door bell when someone was there.

Eugene W. Wines was a special investigator. He testified that on request of the defendant Public Service Company's counsel he had made movie pictures of the plaintiff, Mrs. Baker, in May, 1951. They showed her taking down some washing hanging on a line in her back yard. There was a controversy between counsel, plaintiff's counsel contending the picture film appeared to accelerate the natural life motions.

During his opening statement to the jury attorney Rosecan for the plaintiff-respondent Baker informed them that the defendant-appellant Public Service Company's southbound bus on Eighth Street was going through the O'Fallon Street intersection at least 25 miles per hour; and "if the operator of the bus testifies in court as he did under oath when his deposition was taken * * *." Appellant Public Service Company's counsel interrupted and objected to respondent's "arguing his case at this time and making any statements other than what witnesses he intends to introduce himself."

The court overruled the objection, and respondent's counsel continued by stating that the bus operator *will tell you* he could not see eastbound on O'Fallon Street because there were some tractor-trailers parked along the north curb of O'Fallon, right east of Eighth Street, and that he struck a westbound automobile on O'Fallon; that he covered 75 feet before he got into the intersection in this blind spot and continued at about 25 miles per hour until

he struck the automobile broadside and dragged or pushed it about 50 feet.

Appellant's counsel objected to these opening statements made by respondent's counsel as to what the bus operator *will* testify to, unless he intended to introduce the testimony of the bus operator; and also because it was outside the scope of his pleading. Respondent's counsel answered that he was going to assume appellant's counsel was going to bring in "your own operator as a witness in this case." Thereupon the following proceedings took place at the bench out of the hearing of the jury.

Counsel for the appellant Public Service Company replied that he didn't make his objection for the purpose of having plaintiff's counsel make this "free-wheeling motion of his" in front of the jury, and he objected to the statement just made by plaintiff's counsel about what he supposed appellant's counsel was going to do. And he further asked for a mistrial at the time. Plaintiff's counsel answered that appellant's counsel was attempting to put immediately on him the burden of producing the bus operator, or forcing him to say whether *he* would or would not do it. Continuing plaintiff's counsel said if defendant's counsel did not produce its own operator he could draw an unfavorable inference from it during the course of the argument. The court intervened saying if Mr. Rosecan, plaintiff's counsel, makes a statement in his opening statement that he can't prove "then there will be before us a failure of proof on that point, and you [appellant's counsel] have a right to argue that question to me on a motion to dismiss and to this jury if it is a submissible case to the jury."

Plaintiff's counsel then proceeded to put on his evidence and closed his case in chief without producing the bus operator as a witness. Thereupon the defendant-appellant filed a motion for a directed verdict on eight specified grounds, which the trial court overruled. Defendant's counsel then made his opening statement, and put on his evidence. At the close of the defendant-appellant's case counsel for plaintiff public-

ly inquired if Mr. Noris Cox, the bus operator, was in the court room and there was no answer. He indicated a subpoena had been issued for Cox.

Plaintiff-respondent then put on his evidence in rebuttal, calling first a witness Harris Meacham, who was a stockholder in the Mound City Business College along with the plaintiff and her husband. The witness testified as to the kind and amount of work the plaintiff did in the college before and after the casualty. He indicated it was greater and that she was more "calm" before that, and very much more excitable afterward.

Next William Windschiegl, a deputy sheriff was called by the plaintiff's counsel, Mr. Rosecan. The witness stated that the night before at counsel's request he had made out and personally served on the bus driver Cox a subpoena for his appearance in court the next morning, June 11, at 10 o'clock. The witness did not appear. Another witness, Mr. Tepper a lawyer, testified that at the request of plaintiff's counsel he had attempted to subpoena the bus driver Cox the preceding Saturday [apparently June 7] but he was not at home. The next day Cox's son told him on the telephone that Cox would be in court on Monday morning, June 9. On this showing plaintiff's counsel rested her case until Wednesday afternoon, June 11, when the cause was argued to the jury. In the meantime the bus driver had come into court.

In his opening argument plaintiff's counsel said, quoting substantially, "the only testimony that they (defendant-appellant) brought forth as to the manner in which this accident occurred was Mrs. Thurman, an elderly lady. I believe she thought she was telling the truth. I *know* she was mistaken." Continuing he said;

"There is, there always has been, a witness available to the Public Service Company, the best possible witness as to the manner in which this accident occurred, a trained employee of theirs, a man trained in the operation of buses, a man whose duty it is to observe the happenings on the street and at intersections, a man in whose hands the Public Service Company places the safety of hundreds of thousands of people in St. Louis each year: the driver of their bus on this occasion. There he sits, ladies and gentlemen (indicating). He was attached by the sheriff, to be brought into this courtroom, *so that you could see him.* (Italics ours.)

"Mr. Rosecan: He is still in the employ—

"Mr. Stephens: I object to that statement for the reason that the attachment was not served on the witness until after he was brought in, and he came in voluntarily. That's untrue and Mr. Rosecan knows it is untrue.

"Mr. Rosecan: He 'came in voluntarily.' He refused to respond to a subpoena, and if, after you knew he was going to be attached, you recommended he be brought in, that might be something different.

"The Court: Overruled.

"Mr. Rosecan: There's a man who knows what happened; there's the man at the wheel; there's the man at the controls; there's the man whose duty it was to look; and, why didn't they put him on the stand, their own employee? Why? You have a right to know why. You have a right to infer why. Because that man would have testified that he did not stop at that intersection; he would have testified he was going twenty-five miles an hour through the intersection; he would have testified he didn't sound a horn, he didn't put on his brakes; and he would have testified that there were tractor-trailers lined up on the north side of O'Fallon Street right east of Eighth Street that obstructed his view—

"Mr. Stephens: Just a minute, Mr. Rosecan, please, I object to this line of argument for the reason that there is no such evidence before the Court, Your Honor.

"The Court: Sustained.

"Mr. Stephens: He may infer what he probably might say, but not tell the jury what he thinks the witness would say.

"The Court: Sustained.

"Mr. Rosecan: You have a right to infer he would have testified to facts that make the Public Service Company as clearly responsible for this accident as anything that has ever happened in our lifetime; and if he, their own employee, could under oath have testified to one single, solitary fact, that would have excused them or absolved them or cleared them of negligence, don't you think they would have brought him in and put him on the stand? Why have they hidden him out? Why have they refused to bring him here? Why haven't you as jurors been given the benefit of his testimony?

"I don't believe any American jury is going to bite into the rotten apple that the Public Service Company is trying to palm off on you in this case, and ask you, in the light of what they refused to bring in, what they held back from you, to take the testimony of Mrs. Thurman and find that the Public Service Company was completely innocent of any negligence. And you must find—before you can find for the Public Service Company, you must find that they were completely innocent of any particle of negligence that contributed to this accident, or else it would be a violation of your oaths as jurors to find a verdict for the Public Service Company,

"And you have a right as jurors to infer—you have the right, the law gives you this right—you have the right to infer that had they brought their own witnesses, their own employees, that those employees and their own witnesses would have testified to facts which prove them, beyond the shadow of a doubt, guilty of negligence. They could have brought in their repairmen. How much damage was done to the bus? If it was only going five miles an hour, was the front end caved in? How far did the bus travel after the impact?"

As will be seen, respondent's counsel in argument to the jury assumed the appellant's bus driver would have confessed negligence if he had been put on the witness stand by appellant. Indeed, in his opening statement he predicted that if the bus driver "testifies in court as he did under oath when his deposition was taken"—here he was interrupted by an objection by appellant's counsel. But respondent never introduced the deposition.

The defendant-appellant Public Service Company's first assignment of error is that the trial court erred in overruling the improper and prejudicial opening statement and argument of plaintiff-respondent's counsel when he stated to the jury that the bus driver would testify he was guilty of gross negligence and aggravated liability in operating the bus (specifying it) when it was apparent from counsel's remarks that he was not acting in good faith and had no intention of introducing such testimony, and did not do so, either by putting the bus driver on the stand or using his deposition but merely had him attached by the sheriff and brought into court at the close of the case "so that you (the jury) could see him." Later respondent's counsel said "I subpoenaed him for any use you (appellant's counsel) wanted to make of him in this case." Obviously this means plaintiff's counsel never did intend to use the witness as his own.

It is said in 64 C.J., § 251, p. 237: "Counsel must restrict his opening statement to the issues of the case and to the theory of the case as fixed by the pleadings. * * * Counsel will not be permitted to make the opening statement a medium for arguing the merits, or the law, nor will the relation of testimony at length be tolerated." So also 63 Am.Jur., § 967, p. 680, states: "Common instances of causes for * * * declaring a mistrial are improper remarks or conduct of counsel." In this case plaintiff's counsel in his opening statement told the jury "If the operator of the bus testifies in court as he did under oath when his deposition was taken"—whereupon appellant's counsel objected to respondent's counsel arguing his case and making statements other than those coming from witnesses he intends to introduce himself, and the court overruled the objection. Thereupon counsel, emboldened by that ruling, said the *bus operator would say* he could not see ahead on O'Fallon Street.

On this point defendant-appellant's brief cites Buck v. Buck, 267 Mo. 644, 660, 185 S.W. 208, 212 (11, 12), a will contest where the trial court permitted counsel for respondents in his opening statement to the jury to say: "He was a spendthrift son. He never did anything for the support of the family. He took from his mother's estate so far as he could, and his family had to leave the city of St. Louis to get rid of him, or to get rid of his attempts to get the family's money. He was not a success in business life."

This court said: "The issues clearly defined were as to the mental capacity of the testator to make a will and undue influence. While counsel in their opening statements to juries are authorized to state in good faith their claims as to the law and the facts so far as same are necessary to enable the jury to understand the case, under no theory of this case, with any proper regard for the rules of evidence, were these remarks permissible. They constitute nothing more than personal reflections upon the character of the contestant, and, whether true or false, were highly improper."

Other cases cited by appellant are Dees v. Skrainka Const. Co., 320 Mo. 839, 847–849, 8 S.W.2d 873, 876–877; Starnes v. St. Joseph Ry. Light, Heat & Power Co., 331 Mo. 44, 51, 52 S.W.2d 852, 854–855; Hancock v. Kansas City Term. Ry. Co., 339 Mo. 1237, 1259(4), 100 S.W.2d 570, 581–582 (8, 9); Jackman v. St. Louis & H. R. Co., Mo.App., 206 S.W. 244, 246(4); Asadorian v. Sayman, Mo.App., 282 S.W. 507, 510(6).

In the Dees case, supra, the plaintiff fireman's foot had been run over by a motorized movable concrete mixer operated by an engineer. In his opening statement plaintiff's counsel said [320 Mo. 839, 8 S.W.2d 876: "I think the evidence will show this was not the first foot he went over—", and thereafter stated: "We will show you by the evidence that he had gone over another fireman's foot before this". Plaintiff failed to prove these facts, but did prove the engineer had started the machine without warning, injuring the backs of firemen using water hose and wheelbarrows for loading purposes. It was held this difference in the proof was not sufficient to constitute a fatal variance.

The Starnes case, supra, was a slander damage suit growing out of a controversy over a bill for electric current allegedly obtained fraudulently by the plaintiff by tampering with the defendant's meter, which constituted a misdemeanor under Sec. 4106, R.S. 1929, Section 560.295 RSMo 1949, V. A.M.S. Plaintiff's counsel in his opening statement to the jury told them the defendant company had offered to refund $18 to him (plaintiff) if he would sign a release of the slander damage suit, which offer plaintiff refused. Counsel for the defendant company moved to discharge the jury on the ground that its rejected offer was an offer of compromise and privileged. The trial court overruled that contention but this court overruled the trial court and reversed and remanded the cause for a new trial.

The Hancock case, supra, [339 Mo. 1237, 100 S.W.2d 581], was a suit under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., brought by the plaintiff-respondent widow and administratrix of the estate of her deceased husband, defendant-appellant's switchman, for his wrongful death in a switching operation. She recovered a judgment for $50,000 which was reduced by remittitur to $30,000. On appeal this court reversed and remanded the cause because of prejudicial and inflammatory argument of plaintiff's counsel outside the record. There was one eyewitness on each side. A member of the switch crew said he saw the deceased take one drink of whiskey eight or ten minutes before. He missed the "grabiron", fell and was run over. The other witness, a transfer company employee said another member of the switch crew collided with the deceased and knocked him in the path of the engine tender.

Plaintiff's counsel argued that the defendant railroad's counsel relied on the defense that the deceased was drunk and was seeking to influence the jury against the widow and orphan children of the dead man, when he knew he could not support the charge; that it was a "damnable thing" and "an assault on the memory of a dead man"; and

that the only honorable thing the defendant's counsel could do would be to "tender 'apologies to the widow and to the memory of the dead man'"; that he sought to "blacken the memory of a dead man" and to "blacken the widow and orphan". The judgment was reversed and the cause remanded because of this argument.

In Jackman v. St. Louis & H. Ry. Co., Mo.App., 206 S.W. 244, 245–246, plaintiff's counsel in a railroad personal injury suit charged in his argument to the jury that the railroad tried to "buy me like their agent, Dameron. $150; $200." Then he qualified that by saying Dameron advised him to settle the case, and thereafter offered to withdraw any remark, "if there is any objection." The court said "I will sustain the objection". It was argued that the remarks should not be regarded as prejudicial because they were made in opening argument, and not in closing argument when opposing counsel have no opportunity to reply. But the Court of Appeals did not accede to that view, and the cause was reversed and remanded.

In our opinion plaintiff-respondent's counsel had no right to comment on the failure of the bus driver to testify and to state to the jury what he would say, especially in view of the fact that counsel in his own opening statement had told the jury that the bus driver had testified under oath when his deposition was taken, and had said: "The Public Service operator will tell you that he could not see eastbound on O'Fallon Street because some tractor-trailers, he will say, that were parked along the north curb of O'Fallon * * *, and that he struck a westbound automobile on O'Fallon * * * and he will tell you that, nevertheless, he could not see into the intersection * * *, and that he struck the car broadside." Answering this appellant's counsel objected to the statement unless respondent's counsel intended to introduce the testimony of the operator, whereupon respondent's counsel retorted he was going to assume appellant's counsel would bring in its own operator.

In his opening argument plaintiff-respondent's counsel said the defendant's defense was "a fake and a fraud," and he pointed out to the jury the bus driver, who was sitting in the court room, saying he had been attached so you (the jury) "could see him." Continuing, respondent's counsel said the bus driver would have testified he didn't stop at the intersection, was going 25 miles per hour, didn't sound a horn or put on his brakes; and that his view was obstructed by the tractors.

The trial court sustained objections to this line of argument, but respondent's counsel went on, telling the jury they had a right to infer the bus driver would have testified to facts making the appellant Public Service Company as clearly responsible for the accident as anything that ever happened in our lifetime; and that if the bus driver could under oath have testified to a single solitary fact that would have excused them from negligence, the Public Service Company would have put him on the stand. Then counsel asked why he had hidden him out and refused to bring him in. Finally counsel said: "I don't believe any American jury is going to bite into the rotten apple that the Public Service Company is trying to palm off on you in this case * * *."

Appellant's counsel confined his argument mainly to the merits, the injuries the plaintiff received and her conduct and state of health before and after the casualty, along with the medical testimony. He said he felt no responsibility or duty to produce the bus driver Cox as a witness; that Mrs. Thurman, who was the plaintiff's seat mate on the bus, had testified as to the nature and violence of the collision; and that if the bus driver had testified plaintiff's counsel would have argued he was interested in the outcome of the casualty. Defendant's counsel further pointed out that plaintiff's counsel himself had not used the bus driver as a witness, though he was present in the court room under subpoena before the case was closed. To that plaintiff's counsel answered that he had subpoenaed the bus driver "for any use you (defendant' counsel) wanted to make of him in the case."

In the concluding argument of plaintiff-respondent's counsel he said the appellant

Public Service Company had admitted liability [which appellant's counsel interrupted to deny] and that the driver of the other automobile figuring in the collision was "innocent". But the main part of his argument was directed to the injuries the plaintiff had received and the permanency thereof. He argued the jury's verdict should be for $25,000. This closed the case for submission to the jury except for two matters. The first was that the court set the case down for hearing nine days later on June 20, on the question whether the bus driver had been guilty of contempt in failing promptly to obey the subpoena issued for his appearance in court on June 11, the last day of the trial.

The other matter arose from this. The next morning, June 12, the court's attention was called to an article which appeared in the St. Louis Globe Democrat, captioned "Bus Driver's Arrest Ordered for Failure to Appear as a Witness." This was before the cause had been submitted to the jury. Upon interrogation of all the jurors it appeared none of them had seen or read the article or been affected by it, and the cause was submitted to them that day, June 12, and nine of them signed a verdict for the plaintiff-respondent for $9,000 and on a poll acquiesced in the verdict

The foregoing issue as to the newspaper article was raised in defendant-appellant's motion for new trial, along with other matters, such as that the bus driver was arrested for contempt and brought into court as a common criminal, for his failure to obey plaintiff's subpoena summoning him into court on the last day of the trial. Those questions were taken up nearly a month later on September 8. With respect to the newspaper article, the newspaper reporter who originated it was a Mr. Kramer.

It purportedly said: "Rosecan (plaintiff's counsel) said he wanted Cox (the bus driver) as a witness because the bus driver had stated in a *deposition* that he 'was counting change at the time of the accident,'" (and therefore not watching). The deposition referred to was exhibited to him (Kramer) and he admitted that the foregoing state-

ment about counting change did not appear therein. He also admitted plaintiff's counsel, Mr. Rosecans, did not tell him that. Rosecans denied it and Mr. Stevens, appellant's counsel, corroborated that statement.

Finally plaintiff's counsel Rosecans said he did not know who had given that information to the newspaper, and he stated that after it appeared in the newspaper he heard typical court house rumors to the effect that the bus driver had testified in another deposition in another case that he "was counting change" when the collision occurred. A week later the trial court overruled the defendant-appellant's motion for new trial, and judgment was entered in accordance with the verdict.

■ In our opinion there is error in the record on the part of the respondent in his opening statement and argument. As said in 64 C.J., § 251, p. 237: "Counsel will not be permitted to make the opening statement a medium for arguing the merits, or the law * * *." Yet in this case counsel stated to the jury as a fact that the *bus operator will tell you* he couldn't see down O'Fallon Street on which the automobile was approaching, how fast he was going, and how far the bus had gone before it reached the intersection where the collision occurred. Yet he did not call the bus operator as a witness or use his deposition.

■ And in his argument to the jury after he had subpoenaed the bus operator he did not use him and told the jury the operator had been brought in "so that you (the jury) *could see him.*" Then he told the jury "there's a man who knows what happened," and went on to say the operator would have confessed negligence as to speed, acceleration and signaling if he had been called as a witness. Then he went on to say that if the defendant Public Service Company had brought in their other employees, including repairmen, they would have proved negligence beyond a reasonable doubt. But he disclaimed using the bus operator as his own witness, and said "I subpoenaed him for any use you wanted to make of him." Further he said: "I know the defendant Public Service Company is

guilty in this case and they have admitted liability in this case, when *I* know the other man (the car operator) is not." Appellant's counsel objected and denied that statement and respondent's counsel qualified his statement and said "Well practically."

Without protracting the opinion, it is the view of the writer that there was error in the trial of the case in the opening statement and opening and closing argument of respondent's counsel and that the judgment should be reversed and the cause remanded. It is so ordered.

LEEDY, J., concurs.

TIPTON, P. J., concurs in result.

Adopted as the opinion of the court en banc.

LEEDY, J., concurs.

HYDE, HOLLINGSWORTH, and DALTON, JJ., concur in result.

CONKLING, C. J., concurs in result only.

BENNICK and CAVE, Special Judges, concur in result.